UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:12-CV-00704-TBR

ARAFU LUKUDU, *et al.*                                                    Plaintiffs

v.

JBS USA, LLC, *et al.*                                                     Defendants


## MEMORANDUM OPINION

This matter is before the Court upon Defendants JBS USA, LLC, and Swift Pork Company's Motion for Summary Judgment. (Docket No. 22.) Plaintiff Abbas Ibrahim has responded in opposition, (Docket No. 29), and Defendants have replied, (Docket No. 30). This matter now if ripe for adjudication. For the reasons that follow, Defendants' Motion will be GRANTED and summary judgment entered in their favor.


## BACKGROUND

Plaintiffs Arufu Lukudu and Abbas Ibrahim filed their Complaint in this matter on October 24, 2012, asserting various claims for relief arising out of the termination of their employment with Defendants. (*See* Docket No. 1.) Plaintiffs have informed the Court that since the filing of Defendants' Motion for Summary Judgment, Plaintiff Lukudu has reached a settlement agreement with Defendants and is no longer a party to this action. (Docket No. 29, at 1.) Accordingly, this Opinion will address itself to the claims of the remaining Plaintiff, Ibrahim.

Much of the factual background pertinent to this action does not appear in dispute. JBS USA, LLC (JBS), is a hog slaughtering and processing plant located in Louisville, Kentucky. Employees at JBS are represented by the United Food and Commercial Workers International Union, District Union Local 227. Ibrahim and Lukudu were bargaining unit employees represented by the Union. Ibrahim is a black male who was born in Sudan and who immigrated to the United States in 2004. Ibrahim and Lukudu have lived together since 2008 and have a child together. They are not married, although at various times have referred to one another as the other's husband or wife.

JBS had a written attendance policy in effect at the time of Ibrahim's termination. That policy is embodied in JBS's "Absentee Control Program." (Docket No. 25-5.) JBS also has a written "Employee Handbook," which incorporates the Absentee Control Program. (Docket No. 25-6.) JBS reviews the Employee Handbook and Absentee Control Program with all newly hired employees. The Absentee Control Program requires that employees call in to a specified hotline number if they cannot report for work as scheduled or on time. Employees are assessed "occurrence points" for missing work or failing to report to work on time. For example, an employee's failure to report to work on time is recorded and counted as a ½ occurrence point, and an employee's failure to report to work for any reason (other than certain excused absences) is recorded and counted as 1 occurrence point for each day missed, provided that the employee notifies JBS within two hours of his or her scheduled starting time by calling in. (Docket No. 25-5, at 2.) An employee's failure to report to work for two or more consecutive days due to illness will be recorded and counted as only 1 occurrence

point, provided that the employee's illness is substantiated by appropriate documentation. (Docket No. 25-5, at 2-3.) An employee's failure to report to work and failure to notify JBS by calling in is considered a "no call/no show" and recorded as 2 occurrence points. (Docket No. 25-5, at 3.) An employee who is absent from work for three or more consecutive days without good cause is deemed to have voluntarily quit. (Docket Nos. 25-2, at 6; 25-5, at 3.)

An employee who accumulates 5 occurrence points within a twelve-month period is issued a "Final Written Warning," and an employee may be terminated for accumulating 7 or more occurrence points within that period. (Docket No. 25-5, at 4.) (Docket No. 25-5, at 4.) The Employee Handbook reinforces this provision of the Absentee Control Program by listing "exceed[ing] six and a half (6 ½) absence occurrences within one year" as a "major violation," meaning one which is "just cause for termination." (Docket No. 25-6, at 8-9.)

Under the terms of the Absentee Control Program, certain absences are considered "excused absences" and are not counted as "occurrences." Among such excused absences are "[a]uthorized leaves of absence for reasons of serious or emergency nature." (Docket No. 25-5, at 3.) The policy states that such "[l]eaves of absence must be approved by the Human Resources Manager and applicable Division Manager." (Docket No. 25-5, at 3.) The Employee Handbook lists and describes the types of leaves of absence that are available to employees, among which is leave under the Family and Medical Leave Act (FMLA). (Docket No. 25-6, at 12.) The policy explains that an employee is responsible for completing a written application for FMLA leave. (Docket No. 25-6, at 12.) The policy further provides that if the employee is

unable to complete the application before taking leave due to an accident or circumstances beyond the employee's control, an application for leave may be completed "upon the employee's first reasonable opportunity to do so." (Docket No. 25-6, at 12.) The policy also explains that "[i]n order for an FMLA leave to be approved, it is the responsibility of the employee to obtain from their physician a fully executed Physician's Certification packet, which will be provided to the employee by [JBS]." (Docket No. 25-6, at 13.) Employees are advised that their failure to obtain and submit the completed Physician's Certification packet may result in delay or denial of FMLA leave, in which case "the leave may be treated as an unexcused absence." (Docket No. 25-6, at 13.) An employee who fails to return to work upon expiration of an approved FMLA leave is considered to have voluntarily quit. (Docket No. 25-6, at 13.)

The Employee Handbook additionally contains a "Zero-Tolerance Harassment Policy," which prohibits all forms of discrimination and harassment on the basis of sex, race, age, national origin, or disability. (Docket No. 25-6, at 10-11.) That policy advises that any employee who feels he or she has been subject to discrimination or harassment should report the alleged charge to a number of listed individuals or by calling a corporate hotline number. (Docket No. 25-6, at 11.) JBS's nondiscrimination policy is further reflected in the collective-bargaining agreement between it and the Union. (*See* Docket No. 25-2, at 3.)

Ibrahim began working at JBS in 2004. Ibrahim was discharged in 2006 for three no call/no shows but was subsequently reinstated after providing documentation showing he had called in prior to each absence. On June 6, 2011, JBS issued Ibrahim a

Final Written Warning informing him that he had accumulated 6 ½ occurrence points and may be terminated upon accumulating 7 or more. (Docket No. 25-14, at 2.) On June 7, 2011, Ibrahim met with his supervisor and was given a copy of his attendance calendar. (Docket No. 25-3, at 6-7.) Ibrahim was scheduled to work the following day, June 8, 2011, beginning at 7:00 a.m.[1] Around 5:00 a.m. on June 8, Ibrahim states that he received a call from Norton Hospital informing him that Lukudu, who was then pregnant, was going to have an operation.[2] (Docket No. 25-3, at 6.) Ibrahim states that he called the call-in number at JBS and left a message telling them "I have a family problem and I am going to the hospital but like I didn't tell them when I'm going to be back." (Docket No. 25-3, at 6.) Ibrahim was again absent on June 8, because, as he testified: "My wife, she was in the hospital and she was in serious -- she had disease and the doctor he said he gonna -- she gonna have surgery." (Docket No. 25-3, at 5, 7.) JBS terminated Ibrahim the following day. (Docket Nos. 25-3, at 7; 25-13, at 2.) The "Termination Notice" provided to Ibrahim on June 9, 2011, recited that Ibrahim's attendance had been reviewed with him on June 6 when he had 6 ½ occurrence points and that Ibrahim acknowledged receiving final written warning, and informed Ibrahim that he was being terminated for accumulating 7 ½ occurrence points. (Docket No. 25-13, at 2.)

Ibrahim testified that he spoke to his supervisor about requesting FMLA leave on June 7, 2011, but denies that he picked up a packet of FMLA forms. (Docket No.

---

[1] Though not material to the Court's determination of this matter, the Court notes that Ibrahim's deposition testimony and sworn affidavit are inconsistent as to the time he was to report to work on June 8, 2011. (*Compare* Docket No. 25-3, at 6, *with* Docket No. 29-2, at 2.)

[2] This statement also is somewhat consistent as between Ibrahim's deposition testimony and sworn affidavit. (*Compare* Docket No. 25-3, at 6, *with* Docket No. 29-2, at 1-2.)

25-3, at 5-6.)  Ibrahim further acknowledged that he did not submit any paperwork for FMLA leave concerning his absences.  (Docket No. 25-3, at 5-6.)

Ibrahim filed a grievance contesting his termination, also on June 9.  (Docket No. 25-15, at 2.)  The Union pursued Ibrahim's grievance through Steps 1 and 2 of the grievance process but did not pursue it further.  (*See* Docket No. 25-15, at 2.)

Then on August 8, 2012, Ibrahim filed a "Charge of Discrimination" with the Kentucky Commission on Human Rights and the Equal Employment Opportunity Commission (EEOC).  (Docket No. 25-16, at 2.)  In the section of that document for identifying the bases of discrimination, Ibrahim checked the boxes for "Race," "National Origin," and "Disability."  (Docket No. 25-16, at 2.)  In that sworn Charge, Ibrahim stated:

> On June 8, 2011, I was called into the office and told that my wife was going to deliver the baby and that I should go to the hospital.  When I sought to leave work to visit my wife at the hospital for the impending birth of my child, I was disciplined and terminated from employment on June 9, 2011.  Other similarly-situated employees of JBS Swift were treated more favorably in the terms and conditions of employment.
>
> I believe I have been discriminated against due to my race, Black and National Origin Sudanese, in violation of Title VII of the Civil Rights Act of 1964, as amended.[3]

(Docket No. 25-16, at 2.)  The EEOC issued Ibrahim a notice of dismissal and right to sue on July 26, 2012.  (Docket No. 1-2.)

---

[3] Notably, this sworn statement is inconsistent with both Ibrahim's deposition testimony and affidavit regarding the events on June 8, 2011.  (*Compare* Docket No. 25-16, at 2, *with* Docket No. 25-3, at 6, *and* Docket No. 29-2, at 1-2.)

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

Ibrahim's Complaint alleges six counts: (1) discrimination on the basis of his color, race, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a); (2) discrimination on the basis of his color, race, and national origin in violation of the Kentucky Civil Rights Act (KCRA), Ky. Rev. Stat. § 344 *et seq.*; (3) discrimination on the basis of his association with a person with a disability or perceived disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(4); (4) discrimination on the basis of his association with a person with a disability in violations of the KCRA; (5) retaliation for his request for leave in violation of the FMLA, 29 U.S.C. § 2615(a)(2); and (6) interference with his rights under the FMLA by denying his request for FMLA leave and by terminating his employment in violation of 29 U.S.C. § 2615(a)(1). In addition to compensatory damages, Ibrahim seeks punitive damages under 42 U.S.C. § 1981a(b)(1). Defendants presently move for summary judgment on each of Ibrahim's claims.

## I.     Title VII Claim and Related KCRA Claim

Ibrahim alleges discriminatory conduct on the basis of his color, race, and Sudanese origin in Defendants' decision to terminate his employment. Because the purpose of the KCRA is "[t]o provide for execution within the state of the policies embodied in [Title VII]," Ky. Rev. Stat. § 344.020(1)(a), courts apply federal Title VII precedent to discrimination claims brought under the KCRA. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009); *see also Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 434 (6th Cir. 2009) (noting that "[t]he language of the KCRA generally tracks the language of Title VII and, thus, should be interpreted consonant

with federal interpretation" (internal quotation marks omitted)). Accordingly, the Court will address Ibrahim's Title VII claim and related KCRA claim concurrently here.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Intentional discrimination claims under Title VII may be proven by either direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 649 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

As a threshold matter, the Court must determine whether to evaluate Ibrahim's claims under a single-motive or mixed-motive analysis. The former is analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Using that framework, "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). Once the plaintiff does so, "[t]he defendant must then offer admissible evidence of a legitimate,

nondiscriminatory reason for its action." *Id.* (quoting *Blair*, 505 F.3d at 524). Then, if the defendant meets that burden, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* (quoting *Blair*, 505 F.3d at 524). "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (alteration in original) (quoting *Blair*, 505 F.3d at 524).

A mixed-motive analysis, on the other hand, "applies to cases 'where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives.'" *Ondricko*, 689 F.3d at 649 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003)). Under Title VII, a plaintiff can proceed on a mixed-motive claim by "demonstrat[ing] that race, color, . . . or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see Ondricko*, 689 F.3d at 649. A mixed-motive claim, like a single-motive claim, may be pursued "based on direct evidence or solely on circumstantial evidence." *Ondricko*, 689 F.3d at 649 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003)).

"A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims." *Id.* (quoting *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010)). Although Ibrahim did not give notice he was bringing a mixed-motive claim in his Complaint, he did so in responding to Defendants' instant Motion for Summary Judgment. The Sixth Circuit has held that a plaintiff gives adequate notice of a mixed-motive claim by raising the issue in response to a motion for summary judgment. *See*

*id.*; *Hashem-Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009). As such, the Court will proceed to conduct a mixed-motive analysis of Ibrahim's Title VII and related KCRA claims.

"[T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, . . . or national origin was a motivating factor' for the defendant's adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(m)). Thus, the ultimate question is whether the plaintiff has presented evidence, either direct or circumstantial, from which a reasonable jury could logically infer that his race, color, or national origin was a motivating factor in the defendant's decision to terminate his employment. *Ondricko*, 689 F.3d at 649; *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006)). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White*, 533 F.3d at 400 (referencing *Anderson*, 477 U.S. at 252). In a pretext case, "the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *Id.* at 401. Therefore, "[t]he only question that a court need ask in determining whether the plaintiff is entitled to submit his claim to a jury in such cases is whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance

of the evidence, that race, color, . . . or national origin was a motivating factor for the defendant's adverse employment decision." *Id.* (internal quotation marks omitted) (quoting *Desert Palace*, 539 U.S. at 101).

Ibrahim has failed to present sufficient evidence that his race, color, or Sudanese origin was a motivating factor in the Defendants' decision to terminate his employment. Ibrahim relies entirely on his own deposition testimony concerning two other employees—an employee named "Manuel" and an unnamed white employee—who Ibrahim says received more occurrence points under the Absentee Control Program but were not terminated. Ibrahim testified that Manuel, who Ibrahim describes as "Spanish" but whose last name Ibrahim did not know, told Ibrahim that Manuel "ha[d] like 12 points." (Docket No. 25-3, at 8.) Ibrahim asserts that Manuel was not terminated despite accumulating more occurrence points that did Ibrahim. (Docket No. 25-3, at 8.) As for the other employee, when asked whether he knew any white employees who were not terminated despite having more than 7 occurrence points, Ibrahim testified: "I know one guy, he was working there and he had more than seven points. . . . I don't remember his name, but he is tall." (Docket No. 25-3, at 9.) Ibrahim apparently bases his knowledge of this unnamed white employee on seeing some documentation which that employee had left under a table and which showed that he had more than 7 occurrence points. (Docket No. 25-3, at 9-10.) Ibrahim also offers generalized allegations that JBS treated white and Hispanic employees more favorably. (*See* Docket No. 25-3, at 9.)

But Ibrahim offers no further evidence, either direct or circumstantial, in support of these claims. Neither "Manuel" nor the white employee are identified further, and

neither have been deposed in this matter or submitted an affidavit or other statement.  In sum, the record is devoid of evidence to support his claims.  Ibrahim has offered nothing more than unsubstantiated, conclusory allegations and, as such, has failed to show that an illegitimate discriminatory animus factored into the Defendants' decision to terminate him.  *See, e.g.*, *Wright*, 455 F.3d at 713 (holding that a plaintiff's "conclusory allegations unsupported by evidence" did not establish a genuine issue of material facts and thus were not sufficient to overcome summary judgment on his mixed-motive claims).

Ibrahim attempts to argue that it is unreasonable to require him to produce such evidence because "[o]nly JBS has possession of proof necessary to defeat or corroborate [his] testimony regarding the treatment of other employees."  (Docket No. 29, at 8.) However, Ibrahim cannot avoid his burden of establishing a prima facie case simply by contending that Defendants are in possession of the information he needs.  As the Sixth Circuit has long held, "[s]ummary judgment must be entered against a party who fails, after adequate time for discovery, to establish the existence of an element essential to a party's case, and on which a party will bear the burden of proof at trial." *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 893 (6th Cir. 1991).  By Order of January 4, 2013, the Court established that all discovery was to be completed by September 30, 2013.  (Docket No. 13, at 1.)  No request was made for an extension of that deadline.  Accordingly, Ibrahim's failure to obtain the evidence he now contends he needs is no basis for denying summary judgment.  *See Elvis Enters.*, 936 F.2d at 893.

Because he has failed to come forward with sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that his race, color, or national

origin was a motivating factor for the Defendants' adverse employment decision, summary judgment is appropriate on Ibrahim's Title VII and related KCRA claims.

## II.     FMLA Claims

Ibrahim alleges two FMLA claims: retaliation for his request for FMLA leave in violation of 29 U.S.C. § 2615(a)(2) and interference with his rights under the FMLA in violation of § 2615(a)(1) by denying his request for leave and terminating his employment.   Ibrahim's FMLA claims fail as a matter of law for several reasons.

To prevail on an interference-theory claim under the FMLA, an employee must prove: (1) that he was an eligible employee; (2) that the defendant was an employer as defined under the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave the employer notice of his intention to take leave; and (5) that the employer denied him FMLA benefits to which he was entitled.  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).  To establish a retaliation-theory claim, the plaintiff must make out a prima facie case of discrimination by showing:  (1) that he availed himself of a protected right under the FMLA by notifying his employer of his intent to take leave; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action.  *Id.* at 508.  Once a prima facie showing is made, the court will apply the familiar *McDonnell Douglas* burden-shifting test discussed above.  *See id.*

The FMLA provides that eligible employees are entitled to leave for one or more enumerated reasons, which include: (1) "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter," or (2) "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter,

or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(A), (C). Ibrahim insists he was entitled to FMLA coverage for both of these reasons because "[t]he absences for which he was terminated were caused by his need to care for both his newborn child and his partner Afra Lukudu." (Docket No. 29, at 10.) However, Ibrahim's claims fail because he was not entitled to FMLA leave.

First, Ibrahim was not entitled to FMLA leave to care for Lukudu was not Ibrahim's spouse. The FMLA defines "spouse" as meaning "husband or wife, as the case may be." 29 U.S.C. § 2611(13). As set forth in the regulations promulgated under the FMLA, whether Lukudu was Ibrahim's "wife" for purposes of the FMLA is determined by state law. 29 C.F.R. § 825.102 ("Spouse means a husband or wife as defined or recognized under State law for purposes of marriage in the State where the employee resides, including common law marriage in States where it is recognized."); *see Willard v. Ingram Constr. Co.*, 194 F.3d 1315, 1999 WL 801580, at *2 (6th Cir. Sept. 28, 1999) (unpublished table decision). Although Ibrahim has referred to Lukudu at various times as his wife, it is undisputed that the two were not married at the time of Ibrahim's termination. *See generally* Ky. Rev. Stat. § 402 (setting for the requirements for entering into a valid marriage in Kentucky). Moreover, as the Kentucky Court of Appeals recently reaffirmed, "It is well settled in Kentucky that there must be a marriage in fact, and common-law marriages are not recognized as valid." *Pinkhasov v. Petocz*, 331 S.W.3d 285, 296 (Ky. Ct. App. 2011) (citing *McDaniel v. McDaniel*, 280 S.W. 145, 146 (Ky. 1926)); *see Pendleton v. Pendleton*, 531 S.W.2d 507, 509-10 (Ky. 1976) ("[I]n this state there is no such thing as a common-law marriage. What might be a common-law marriage somewhere else is no marriage at all here. As distinguished

from being 'void' or 'illegal' it simply does not exist as a 'marriage' of any kind."). Thus, "regardless of how closely a relationship may resemble a legally valid civil marriage, Kentucky courts will not otherwise recognize such rights and obligations, and thereby reinstitute by judicial fiat common law marriage which by expressed public policy is not recognized." *Pinkhasov*, 331 S.W.3d at 296 (internal quotation marks omitted) (quoting *Murphy v. Bowen*, 756 S.W.2d 149, 150 (Ky. Ct. App. 1988)). Given that Ibrahim and Lukudu were not legally married and that Kentucky does not recognize common-law marriages, Lukudu cannot be Ibrahim's "spouse" for purposes of the FMLA.

Nonetheless, Ibrahim urges: "In this case, the Court should recognize [his] and Lukudu's relationship as a marriage for purposes of FMLA entitlement. While they do not possess a Kentucky marriage license, they are Sudanese immigrants who have lived together continuously since 2008. They have multiple children together, and Ibrahim refers to Lukudu as 'my wife.'" (Docket No. 29, at 12.) Citing a scholarly article in favor of expanding FMLA coverage to domestic partners, Ibrahim insists that the application of state law here "creates a significant gap in coverage for a large number of cohabitating couples and domestic partnerships across the United States." (Docket No. 29, at 12.) But this is not the proper forum to hear Ibrahim's pleas for a change in the FMLA or the regulations thereunder. Accordingly, because Lukudu is not Ibrahim's spouse, Ibrahim was not entitled to FMLA leave under § 2612(a)(1)(C).

Second, Ibrahim was not entitled to FMLA leave under § 2612(a)(1)(A) to care for his son because Ibrahim was terminated one full week before his son was born. In an affidavit attached to his Response, Ibrahim states that his son was born on June 16,

2011.  (Docket No. 29-2, at 2.)  As noted above, *supra* note 2, Ibrahim's deposition testimony and affidavit tell somewhat inconsistent stories as to what exactly Ibrahim was told when he received the call from Norton Hospital on the morning of June 8, 2011.   (In fact, his sworn Charge of Discrimination filed with the Kentucky Commission on Human Rights contradicts both accounts, as there he states he was already at work when he received word about Lukudu. (*See* Docket No. 25-16).) Regardless, it is impossible for Ibrahim to be entitled to FMLA leave "[b]ecause of the birth of a son . . . *and* in order to care for such son" when that son had not yet been born.  § 2612(a)(1)(A) (emphasis added).  It is similarly impossible that any of the 7 ½ occurrence points that were accrued by Ibrahim and that resulted in his termination were in response to his caring for a child who was yet unborn.  Consequently, Ibrahim's interference claim fails because he was not entitled to FMLA leave under § 2612(a)(1)(A).

Furthermore, Ibrahim has not made out a prima facie showing for his FMLA retaliation claim.  It is undisputed that Ibrahim never notified JBS of his intent to request FMLA leave and never submitted any request for FMLA leave.  Thus, he has not shown that he availed himself of a protected right under the FMLA by notifying his employer of his intent to take leave.  Moreover, because Ibrahim was not entitled to FMLA leave and did not, in fact, exercise any rights under the FMLA, he cannot show a causal connection between the exercise of those rights and the adverse employment action taken against him.

For these reasons, summary judgment is appropriate on Ibrahim's FMLA claims.

### III.     ADA Claim and Related KCRA Claim

Ibrahim alleges associational discrimination on the basis of his association with a person with a disability or perceived disability (Lukudu) in violation of the ADA and KCRA.  The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."   42 U.S.C. § 12112(b)(4).   Although the KCRA retains the former definition of "disability," *compare* Ky. Rev. Stat. § 344.010(4), *with* 42 U.S.C. § 12102(2), this Court has recognized that "[t]he disability discrimination provisions of the Kentucky Civil Rights Act parallel the requirements of the Americans with Disabilities Act." *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 657 (W.D. Ky. 2012); *see also* Ky. Rev. Stat. § 344.020(1)(a) (stating that the purpose of the KCRA is "[t]o provide for the execution within the state of the policies embodied in . . . the [ADA]").  As such, the ADA's coverage is broader, and a plaintiff's failure to make a prima facie showing under the ADA necessarily means he cannot make a prima facie showing under the KCRA.  *See id.* at 657-58 & n.3.

Although Defendants argue, by way of footnote, that Lukudu cannot prove she was disabled, this issue does not appear to have been fully briefed by the parties. Therefore, for purposes of this discussion, the Court will assume Lukudu was a qualified individual with a disability.

The Sixth Circuit first addressed § 12112(b)(4) associational discrimination claims in a published opinion in *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482 (6th Cir. 2011).  Noting that such claims "arise[] under an infrequently litigated

section of the Act," the court of appeals looked first to the legislative history accompanying § 12112(b)(4) to ascertain the type of employer conduct prohibited. *Id.* at 486. That legislative history presented the following hypothetical: "[A]ssume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee." H.R. REP. No. 101-485, pt. 2, at 61-62 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 343-44. On this point, the Sixth Circuit reiterated, "Importantly, employers are not required to provide reasonable accommodations to non-disabled workers under this section of the Act." *Stansberry*, 651 F.3d at 486-87. This position finds further support in the interpretive guidance published with the regulations promulgated to implement the ADA. *See* 29 C.F.R. § 1630 app. at 401 ("It should be noted . . . that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability.").

Following the approach taken by several other circuits, the *Stansberry* court held that where a plaintiff does not offer any direct evidence of discrimination, his claim must "be analyzed through a *McDonnell Douglas*-like burden-shifting test." 651 F.3d at 487. Under the formulation adopted by the Sixth Circuit, a plaintiff can make out a prima facie claim under § 12112(b)(4) by showing: (1) that he was qualified for the position; (2) that he was subject to an adverse employment action; (3) that he was

known to be associated with a disabled individual; and (4) that the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision. *Id.* (applying *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997)

In the present case, Ibrahim's associational discrimination claims fail because has offered nothing to show that the decision to terminate his employment occurred under circumstances raising a reasonable inference that Lukudu's disability was a determining factor. On the contrary, the evidence of record reflects that Ibrahim was terminated for his excessive absenteeism in violation of JBS's Absentee Control Program. Ibrahim insists that "JBS'[s] admission that it knew of Lukudu's disability and Ibrahim's undisputed explanation that he was absent to care for her creates at least a genuine dispute of material fact." (Docket No. 29, at 17.) However, as the Sixth Circuit stated in *Stansberry*, "[a] plaintiff cannot bypass the prima facie showing requirement and must offer some evidence to suggest that the adverse employment action he . . . suffered was due in some measure to discriminatory animus before the employer is required to articulate a non-discriminatory reason for the action." 651 F.3d at 488-89 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000)). There is simply nothing to indicate that Ibrahim was terminated for any reason other than his excessive absenteeism, and Ibrahim was failed to offer any evidence to create an inference that he was terminated on account of either Lukudu's disability or his association with her.

Furthermore, even assuming Ibrahim could make out a prima facie case, JBS has offered a legitimate, nondiscriminatory reason for terminating him, and Ibrahim has

offered no evidence showing that this reason is actually a pretext for unlawful discrimination. Although the facts of *Stansberry* differ somewhat from those here, the court's reasoning is equally applicable:

> [E]ven if [the plaintiff] had established a prima facie case, his poor performance is a legitimate non-discriminatory reason for [the defendant] to terminate him. And, [the plaintiff] has offered nothing to show that this reason was pretextual. . . .
>
> Importantly, while [the plaintiff's] poor performance at work was likely due to his wife's illness, that is irrelevant under this provision of the Act. [The plaintiff] was not entitled to a reasonable accommodation on account of his wife's disability. Therefore, because his discharge was based on actually performing his job unsatisfactorily, and not fears that his wife's disability might prevent him from performing adequately, [the defendant's] conduct is not prohibited by this section of the Act. While [the plaintiff's] situation is very unfortunate, he has not offered anything to show that his wife's disability was in any way connected to [the defendant's] decision to discharge him. The only connection is that it possibly caused his performance to slip. Therefore, [the defendant's] decision to terminate [him] does not run afoul of the Act.

*Id.* at 488-89 (citation omitted). Other circuit courts have employed similar reasoning under similar circumstances. *See, e.g.*, *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999); *Hartog*, 129 F.3d at 1083; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755 (5th Cir. 1996); *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 211-14 (4th Cir. 1994). As was the case in *Stansberry*, even if Ibrahim had established a prima facie case, his excessive absenteeism is a legitimate, nondiscriminatory reason for terminating his employment. Though some of Ibrahim's absences may have been due to Lukudu's medical issues, Ibrahim was not entitled to a reasonable accommodation on account of those issues. Because his termination was

based on his violation of JBS's attendance policy, JBS did not run afoul of the ADA by terminating him.

Of final note, Ibrahim's argument that JBS was aware of his and Lukudu's relationship and of "Lukudu's chronic, pregnancy-related medical condition," if anything, serves to weaken Ibrahim's position. The court in *Stansberry*, noting that the defendant "had been aware of [the plaintiff's wife's] illness for many years," expressly concluded, "Because [the defendant] knew of her disability for a long period of time, this undercuts the inference that [the plaintiff's] termination was based on unfounded fears that his wife's disability might cause him to be inattentive at work." 651 F.3d at 488. As in *Stansberry*, JBS's awareness of Lukudu's disability for some six or more months prior to Ibrahim's termination undercuts any inference that he was terminated on account of his association with Lukudu.

Ultimately, the evidence of record reflects that Ibrahim violated a neutral attendance policy and, quite simply, was terminated for that violation. Thus, JBS did not violate the ADA by terminating him, even if the reason for Ibrahim's noncompliance with that policy was to care for Lukudu. *See* H.R. REP. NO. 101-485, pt. 2, at 61-62 ("If [a nondisabled employee] violates a neutral employer policy concerning attendance or tardiness, he . . . may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]."). For these reasons, summary judgment is appropriate on Ibrahim's associational discrimination claims under the ADA and the KCRA.

**IV.    Punitive Damages**

Having found that summary judgment is warranted on each of Ibrahim's six substantive claims, the Court need not address in full Ibrahim's claim for punitive damages and, thus, will do so only briefly in the interest of completeness.

A Title VII claimant is entitled to recover punitive damages only when he can demonstrate by a preponderance of the evidence that the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual."   42 U.S.C. § 1981a(b)(1).  In *Kolstad v. American Dental Association*, the Supreme Court laid out a three-part inquiry for determining whether punitive damages are proper under this standard:  (1) the plaintiff must show that the individuals perpetrating the discrimination acted with malice or reckless disregard as to whether the plaintiff's federally protected rights were being violated; (2) the plaintiff must impute liability to the employer using the common law rules of agency; and (3) even if the plaintiff is successful in proving the first two inquiries, the defendant nonetheless may avoid liability for punitive damages by showing that it engaged in good faith efforts to comply with Title VII.   527 U.S. 526, 536, 542-46 (1999).

Here, the Court is satisfied that Ibrahim has offered no evidence of the sort of "malice or reckless indifference" necessary to sustain a claim for punitive damages under § 1981a(b)(1).  And, even if he had offered such evidence, it would appear that Defendants have shown they engaged in good faith efforts to comply with Title VII through the publication and enforcement of the nondiscrimination policies embodied in JBS's Employee Handbook and its collective bargaining agreement with the Union.  *See*

*generally Parker v. Gen. Extrusions, Inc.*, 491 F.3d 596, 603 (6th Cir. 2007) (noting that "courts interpreting [the good-faith prong] since *Kolstad* have focused both on whether the defendant employer had a written [nondiscrimination] policy and whether the employer effectively publicized and enforced its policy"). Aside from Ibrahim's unsubstantiated, conclusory allegations, there is nothing to indicate that JBS did not enforce its written policies of nondiscrimination. Thus, even if any of his claims were to withstand summary judgment, Ibrahim would not be entitled to punitive damages under § 1981a(b)(1).

## CONCLUSION

Therefore, having considered the parties' arguments and the evidence of record, for the foregoing reasons, the Court will GRANT Defendants' Motion for Summary Judgment, (Docket No. 22), and enter judgment in their favor.

An appropriate Judgment will issue concurrently with this Opinion.

Date:

cc:     Counsel